IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CURTIS MINNARD,                        )
                                       )        2:06-cv-1460-GEB-GGH
                    Plaintiff,         )
                                       )
        v.                             )        ORDER[*]
                                       )
ROTECH HEALTHCARE, INC.,               )
                                       )
                    Defendant.         )
_____    )

        Defendant Rotech Healthcare, Inc. ("Defendant" or "Rotech")
moves for summary judgment on Plaintiff Curtis Minnard's claims that
Defendant fired him in retaliation for complaining about a new
overtime policy, in violation of California's Fair Employment and
Housing Act ("FEHA") and public policy.  Defendant also seeks summary
judgment on the remainder of Plaintiff's claims for defamation,
failure to pay him overtime, failure to pay him immediately upon
firing him, violation of California Business and Professions Code

_____

        [*]   This motion was determined to be suitable for decision without
oral argument.  L.R. 78-230(h).  The caption has been amended to reflect
the dismissal of the doe defendants in the Rule 16 Scheduling Order
filed December 11, 2006.

1

section 17200, intentional infliction of emotional distress ("IIED"), and punitive damages.

FACTUAL BACKGROUND[1]

Plaintiff had worked for Rotech for eight years when he was fired in April 2006.  (Decl. of Pl. in Supp. of Pl.'s Opp'n to Def.'s Mot. ("Pl. Decl.") ¶ 2.)  During the period of time relevant to this action, Plaintiff worked as a Patient Service Technician in Rotech's West Sacramento Office.  (Pl.'s Reply to Def.'s Statement of Undisputed Facts ("SUF") ¶ 1.)  Plaintiff's job duties included delivering home healthcare equipment to patients throughout Northern California and instructing them how to use the equipment.  (Id. ¶ 2.)  Plaintiff typically drove to the office in the morning to pick up his equipment and paperwork, then spent the day making deliveries or helping with warehouse and office work.  (Id. ¶¶ 3-4.)  Prior to 2005, he had received discretionary merit-based pay raises every year for eight years, positive reviews from his supervisors, and no write-ups, disciplinary actions, or other negative reviews.  (Decl. of Malcolm Sher in Supp. of Pl.'s Opp'n to Def.'s Mot. ("Sher Decl."), Ex. 2; Neal Dep. at 172:9-19.)  His last performance review prior to being fired rated him in five out of ten categories as either "outstanding" or "exceeds expectations."  (Sher Decl., Ex. 2.)  In the remaining five categories he was rated as "fully and consistently" meeting his job requirements.  (Id.)

---

[1]     Both Plaintiff and Defendant object to evidence submitted by the other party.  Plaintiff objects to portions of the declarations of Dawn Neal and Jack McKenna.  (See Pl.'s Objections to Evid.)  Defendant objects to portions of the declarations of Sheila Wojcinski and Curtis Minnard, as well as to four exhibits attached to the declaration of Malcolm Sher.  (See Def.'s Objections to Pl.'s Evid.)  The objections will only be addressed when necessary to decide the pending motion.

Plaintiff regularly worked forty hours per week, but also worked overtime. (SUF ¶ 8.) Plaintiff was occasionally on-call, during which time he carried a cell phone or pager, and felt constrained to stay within the Sacramento area and avoid drinking alcohol so he could respond to service calls in a timely manner. (Id. ¶¶ 9-10.) Plaintiff also felt he could not go to parties when he was on call, since parties were loud environments where he might not hear his pager go off. (Pl. Dep. at 103:5-15.) However, no one at Rotech ever told Plaintiff he could not go to parties when he was on call. (Id. at 103:16-18.) Although no written policy set a fixed time within which Plaintiff was required to respond when on-call, he was expected to respond quickly, especially since he was servicing sick patients with breathing difficulties. (Id. ¶ 12; Pl. Decl. ¶ 8.) Prior to 2003, Rotech paid Plaintiff a fixed amount of money for being on-call, plus hourly pay for actually responding to service requests. (Pl. Dep. at 102:10-13.) After 2003, Plaintiff was paid only for time spent actually responding to service requests while he was on-call. (SUF ¶ 13.)

In June and August 2005, Rotech's director of staffing, communication and employee relations, Kathleen Ochab ("Ochab") distributed two e-mails throughout the company on the subject of managing overtime. (Id. ¶ 14.) Subsequently, Joni Moss ("Moss"), a division director, sent an e-mail to the head of each of her offices stating the new "comp time" policy: "[I]f an employee works over 8 hours in one day, you can send them home early on the next day (or a day within the week) to avoid [overtime]." (Id. ¶ 15.) The policy violated California law. (Decl. of Kathleen Ochab in Supp. of Def.'s Mot. ¶ 3.)

1     The head of Rotech's West Sacramento office, where Plaintiff
2  worked, was Dawn Ackerman-Neal ("Neal"). (Id. ¶ 1.) When Neal told
3  Plaintiff about the comp time policy, Plaintiff laughed. (Id. ¶ 16.)
4  Neal told Plaintiff she was "serious" since it was what her own
5  supervisor wanted. (Pl. Dep. at 111:1-2.) Plaintiff told Neal he
6  thought the comp time policy was illegal and that he would be talking
7  to his sister, who is an employment attorney, about the policy. (Neal
8  Dep. at 281:3-15; Pl. Decl. ¶ 13.) In practice, however, Plaintiff
9  was never asked to come in late the day after working overtime, and
10  Plaintiff never lost any overtime compensation as a result of the
11  policy. (SUF ¶¶ 19-20.)

12     On September 20, 2005, Ochab sent an e-mail to certain
13  Rotech supervisors, not including Neal, stating that the comp time
14  policy should not be followed in California. (Id. ¶ 21.) There is no
15  evidence showing whether Neal was informed of Ochab's September 20 e-
16  mail. (Id.) The next day, Plaintiff's sister and attorney, Carla
17  Minnard, sent a letter to Rotech's division director demanding that
18  the company rescind the comp time policy. (Id. ¶ 22.) Rotech's vice
19  president of human resources corresponded with Carla Minnard over the
20  next week concerning the issue. (Id. ¶ 23.) Plaintiff, not wanting
21  to further "rock the boat," eventually decided to drop the matter.
22  (Pl. Decl. ¶ 15.) During his employment, Plaintiff never complained
23  to any government agency concerning the comp time issue. (Pl. Dep. at
24  200:12-23.)

25     Bethany Gilmore ("Gilmore"), who joined Rotech's West
26  Sacramento office in August 2005, testified that when she first began
27  working in the office Neal "was really nice to [Plaintiff], and []
28  would always tell [Gilmore] about how great [Plaintiff] is and how

4

great he is with the patients . . . .” (Gilmore Dep. at 39:6-10.)
However, “over the course of a few months [Neal] stopped talking about
[Plaintiff] so greatly all the time” and began criticizing Plaintiff
to Gilmore. (Id. at 38:11-14.) Neal began to frequently “talk[]
about [Plaintiff] behind his back” to Gilmore on a number of issues,
including Neal’s belief that Plaintiff was spending too much time at
patients’ houses, that Plaintiff was not using a new route planning
program, and that Plaintiff was not servicing as many patients as he
used to. (Id. at 20:20-21:22.) Neal brought up Plaintiff’s comp time
policy complaint in conversation with Gilmore roughly ten times, and
Neal seemed “mad” and “didn’t like” the fact that Plaintiff complained
about the comp time policy. (Id. at 56:1-58:16, 65:19-66:19.)
Gilmore testified that Neal thought Plaintiff had filed a lawsuit
against Rotech over the comp time policy, and called the complaint a
“lawsuit” when she “rant[ed]” to Gilmore about Plaintiff. (Id. at
56:11-17.) Neal’s change in attitude toward Plaintiff coincided with
both Plaintiff’s complaint about the comp time policy, and the
development of a friendship between Gilmore and Plaintiff. (Id. at
38:3-39:18, 56:1-58:16.)

In January 2006, Neal instructed Plaintiff that he would
have to start bringing the truck back to the office at the end of the
day instead of taking it home overnight, and Plaintiff understood that
Neal’s supervisor had issued that directive. (Pl. Dep. at 94:9-
95:15.) Plaintiff’s prior practice had been to call Neal at the end
of the day and ask her whether she wanted him to bring the truck back
to the office or just proceed home. (SUF ¶ 7.) Plaintiff sometimes
returned the truck to the office at the end of the day, but often
drove straight home after making his deliveries. (Id.) Plaintiff

followed Neal's new instruction "maybe once," but then "slid[] right back" to taking the truck home because it was easier for him.  (Pl. Dep. at 94:12-23.)  He testified, "[W]e would laugh at policies such as this."  (Id. at 94:11-12.)  Neal stated she never enforced the truck policy because the office was "too short staffed."  (Neal Dep. at 338:1-339:4.)

In February 2006, Plaintiff went to a shop to have a decal of Rotech's logo placed on the company-owned truck he used for deliveries.  (SUF ¶ 30.)  Plaintiff had placed numerous decals and bumper stickers on the truck in the past, such as "God Bless America" and "Support the Troops," and he had never been admonished or disciplined for doing so.  (Pl. Decl. ¶¶ 18, 20.)  While Plaintiff was at the shop, Neal learned Plaintiff planned to place an American flag decal underneath the Rotech logo.  (SUF ¶ 31.)  Neal called Plaintiff on the phone and told him the company would not pay for the American flag decals, and the truck needed to look "professional."  (Neal Dep. at 198:17-199:19.)  Neal testified that she assumed that by saying the trucks need to look professional, Plaintiff would understand that he should not place the flag decal on the truck.  (Id. at 199:15-24.)  Plaintiff testified that Neal said Plaintiff could not put the decal on the truck "unless [he] want[ed] to pay for it" himself.  (Pl. Dep. at 113:13-14.)  Plaintiff told Neal he would pay for it himself, and said, "It will look wonderful.  You'll see it."  (Id. at 113:16-18.)  Neal responded, "Okay."  (Id. at 113:18.)

Two days after Plaintiff returned to the office with American flag decals on the truck, Neal issued him a counseling notice for destruction of company property and failing to follow company policy.  (Pl. Dep. at 113:20-114:15; Sher Decl., Ex. 13.)  Neal

conceded in her deposition that she could not identify a company policy which Plaintiff had violated.  (Neal Dep. at 291:19-292:21.) She also conceded that she did not provide Plaintiff an opportunity to explain his actions, although the company manual on disciplinary procedures states that "[i]n most instances Rotech will not take disciplinary action against employees without having first conducted an objective analysis of the facts allowing employees the opportunity to explain their actions." (Neal Dep. at 292:22-293:16; Sher Decl., Ex. 18.)  The counseling notice Neal issued to Plaintiff was the first disciplinary write-up he had received as a Rotech employee.  (See Sher Decl., Ex. 2.)  Although he had received merit-based pay raises (which lay in Neal's discretion) every year for the past eight years, he did not receive a merit raise in 2005, the year he complained about the comp time policy.  (Id., Exs. 2 & 3; Pl. Decl. ¶ 4.)

Defendant required every Patient Service Technician, including Plaintiff, to document every delivery made to a patient with a delivery ticket.  (SUF ¶ 41.)  Defendant further required that each ticket be signed and dated by the patient receiving the delivery. (Decl. of Dawn Ackerman-Neal in Supp. of Def.'s Mot. for Summ. J. ("Neal Decl.") ¶ 9; Neal Dep. at 75:6-9; Pl. Dep. at 77:5-9.) However, it was a common practice for Patient Service Technicians to date and sign their own names on the delivery tickets.  (SUF ¶ 43.) Neal commonly asked Patient Service Technicians to fill in missing information on delivery tickets.  (Id. ¶ 44.)  In early 2006, however, Neal told Plaintiff that Rotech was renewing its emphasis on the requirement that the patient must sign and date the tickets.  (Id. ¶ 45.)  Neal testified that she repeatedly informed Plaintiff of this requirement.  (Neal Dep. at 75:1-13, 107:21-108; Neal Decl. ¶ 9.)

However, Neal subsequently returned to her practice of having Patient Service Technicians fill in missing information.  (Pl. Decl. ¶ 34 ("[Neal] continued to hand [Plaintiff] delivery tickets back with missing information and [told him] to fill it in.").)

On April 2, 2006, Neal saw that the date on one of Plaintiff's delivery tickets looked "unusual."  (Neal Decl. ¶ 10.) Neal concluded that Plaintiff had "forged" the date on a particular delivery ticket since the handwriting did not match the patient's signature on that ticket or the handwriting on two other delivery tickets for that same patient.  (Neal Decl. ¶ 10.)  However, Neal never asked Plaintiff or the patient whether Plaintiff had "forged" the date.  (Neal Dep. at 98:22-25.)  Plaintiff later testified that the writing did not look like his and that he "d[id not] know" who wrote in the date but he "might have."  (Pl. Dep. at 142:22-24, 143:3-4.)

Neal testified that she had become increasingly frustrated with Plaintiff's attitude.  (Neal Dep. at 339:7-17.)  However, Neal conceded she never gave Plaintiff any verbal warnings or counseling of any kind about the delivery ticket issue prior to his termination. (Id. at 110:19-111:5.)

Neal testified the delivery ticket issue was the "straw that broke the camel's back."  (Id. at 108:19-109:9.)  Neal sent an e-mail to a Rotech human resources representative stating:  "I currently have a[n] [employee] who has forged a date on a delivery ticket.  Is this grounds for automatic termination[?]  This is his 2nd write up overall but I wanted to check with you before I write up."  (Neal Dep., Ex. 1.)  The human resources department responded that Neal would have to supply the delivery ticket at issue, and that the Rotech West Division

Human Resources Manager Angie Crain ("Crain") would have to approve of terminating Plaintiff's employment. (SUF ¶ 54.) After Neal supplied the delivery ticket, on April 4, 2006, Crain e-mailed Neal and stated: "Ok to term[inate]." (Neal Dep., Ex. 1.) Crain also stated in the e-mail: "Dawn, his name is so familiar to me. Have we talked about him before for some reason?" (Id.) Crain had seen a copy of Carla Minnard's letter about the comp time policy during September 2005, seven months before. (SUF ¶ 56.)

On April 4, 2006, after Crain had given Neal permission to fire Plaintiff, Neal went on a "ride-along" with a respiratory therapist, Rebecca Kauffer-West ("Kauffer-West"), who visited several patients to whom Plaintiff had delivered equipment. (Neal Decl. ¶ 12; Neal Dep. at 116:2-4.) Neal had only gone on one other ride-along with Kauffer-West prior to that time. (Neal Dep. at 117:23-25, 118:1-2.) One patient, Diane L., told Neal that Plaintiff had been at her residence only fifteen minutes setting up equipment, as opposed to the fifty minutes logged on Plaintiff's route sheet, and had not shown the patient how to use the equipment.[2] (Neal Decl. ¶ 12.) Neal testified she took the patient's statement as true, although Neal conceded Plaintiff would never knowingly leave a patient with equipment that they did not know how to use. (Neal Dep. at 151:18-22.) Further, Kauffer-West declared that she and Neal joked "about how out of it [the patient] was and how crazy she was . . . ." (Decl. of Rebecca Kauffer-West in Supp. of Pl.'s Opp'n to Def.'s Mot. ("Kauffer-West Decl.") ¶¶ 4-5.) Another patient, Lewis N., was found to have a

---

[2]     Plaintiff objects to this evidence as hearsay. Accordingly, the statement may not be considered for the truth of the matter asserted therein. Fed. R. Evid. 801.

broken "conserving device."   (Neal Decl. ¶ 12.)   Neal declared that
she concluded the machine was already broken when Plaintiff set it up
three weeks prior, but conceded she "can't prove" this.   (Id.; Neal
Dep. at 122:15-21.)   Neal subsequently conceded that she only assumed
Lewis N.'s conserving device was broken because the patient was not
using it.   (Neal Dep. at 123:1-5.)   Neal made notes of these incidents
and her conclusions, but testified she does not "recall why" she made
these notes after she had already decided to fire Plaintiff.   (Neal
Dep. at 115:6-8.)

After Crain gave Neal permission to fire Plaintiff, Neal
told Gilmore, Kauffer-West, and Neal's husband Doug Neal that
Plaintiff would be fired.   (SUF ¶ 57; Kauffer-West Decl. ¶ 3; Neal
Dep. at 267:22-2.)   Although Neal never told Gilmore that Plaintiff's
complaint about the comp time policy was a factor in the termination
decision, she brought up the issue of Plaintiff's comp time policy
complaint just days before she fired Plaintiff.   (Gilmore Dep. at
65:10-66:19.)

On April 7, 2006, Neal met with Plaintiff and fired him.
(SUF ¶ 63.)   During this meeting, Neal accused Plaintiff of forging
the date on the delivery ticket.   (Pl. Dep. at 254:20-23.)   She also
accused Plaintiff of "fraud," stating that Plaintiff had written down
on his route sheet that he had spent fifty minutes delivering
equipment to patient Diane L. when he had only been there for fifteen
minutes.   (Id. at 254:21-255:3.)   Neal further stated that Plaintiff
had knowingly set up patient Lewis N. with broken equipment.   (Id. at
255:11-22.)   Although Neal listed the Diane L. and Lewis N. issues
when she fired Plaintiff, Neal declared that these incidents were not
factors in her decision to fire Plaintiff.   (Neal Decl. ¶ 13.)   Neal

and Crain both declare that the comp time issue was not a factor in the decision to fire Plaintiff.  (Neal Decl. ¶ 13; Decl. of Angie Crain in Supp. of Def.'s Mot. for Summ. J. ("Crain Decl.") ¶ 6.)

It is undisputed that no other employee was ever disciplined or fired for signing or dating delivery tickets.  (Pl.'s Statement of Undisputed Facts in Opp'n to Def.'s Mot. ¶ 66.)  The Rotech Employee Handbook states that "the majority of rule violations will be handled in accordance" with progressive disciplinary steps, including an "initial counseling," a "written warning" and a "final warning" prior to termination.  (See Sher Decl., Ex. 18.)  However, the employee handbook also states that Rotech "reserves the right to take whatever disciplinary action it deems appropriate to the infraction.  The inclusions of these steps, therefore, do not limit [Rotech's] ability to apply the disciplinary action that matches the infraction as determined by management."  (Id.)

After Neal terminated Plaintiff, a patient whom Plaintiff had serviced named Sheila Wocjinski ("Wocjinski") telephoned Rotech's West Sacramento office to tell Neal that Wocjinski "needed [Plaintiff] to bring [her] a certain number of tanks that week."  (Decl. of Sheila Wocjinski in Opp'n to Def.'s Mot. ("Wocjinski Decl.") ¶ 2.)  Wocjinski spoke with Neal on the telephone, and Neal said she had "let [Plaintiff] go."  (Id.)  Wocjinski asked why, but Neal told her she "could not get into specifics right now, but would call [her] later to talk."  (Id.)  When Neal subsequently called Wocjinski back, Neal told her that Plaintiff "had been signing and dating delivery tickets, and implied that he was forging the signatures of his patients or doing something dishonest in dating or signing the tickets."  (Id. ¶ 3.)  Neal also told Wocjinski that Plaintiff "was putting down overtime

1   that he had not actually worked, up to 2-4 hours a day . . . ."  (Id.

2   ¶ 5.)

3                         DISCUSSION

4   I. FEHA Violation

5           Defendant seeks summary judgment on Plaintiff's claim that

6   Defendant fired him in violation of the FEHA, arguing "because

7   [Plaintiff] never opposed any practice that the FEHA makes unlawful,

8   his claim for retaliation under the FEHA fails as a matter of law."

9   (Mot. at 9:17-19.)

10         The FEHA prohibits retaliation against employees who

11   "opposed any practices forbidden under [the FEHA]," including

12   discrimination and harassment in employment on the basis of sex, race,

13   religion, and other enumerated characteristics.  Cal. Gov't Code §§

14   12940(a), (h).  Plaintiff has not offered evidence showing he

15   complained about an unlawful discrimination or harassment practice

16   forbidden under the FEHA.  (See SUF ¶ 71; Pl. Dep. at 202:25-204:7.)

17   Instead, Plaintiff complained (via Carla Minnard's letter to Rotech's

18   vice president of human resources) that Defendant's comp time policy

19   was an unlawful overtime compensation policy.  (See Sher Decl., Ex.

20   6.)  Since Plaintiff has not shown he was retaliated against for

21   opposing a practice forbidden under the FEHA, Defendant' motion on

22   Plaintiff's FEHA claim is granted.

23   II. Wrongful Termination in Violation of Public Policy

24      A. Fundamental Public Policy

25          Defendant argues Plaintiff's claim for wrongful termination

26   in violation of California's public policy fails since this claim is

27   not tethered to a fundamental public policy.  (Mot. at 9:22-10:16.)

28   Plaintiff counters that this claim is tethered to the fundamental

public policy delineated by California Labor Code section 1102.5
("Section 1102.5").  (Opp'n at 42:2-43:9.)

        "For an employer to be liable for the tort of wrongful
termination in violation of public policy, the employer's conduct must
violate a public policy that is 'fundamental,' 'well established' and
'carefully tethered' to a constitutional or statutory provision."
Carter v. Escondido Union High Sch. Dist., 148 Cal. App. 4th 922, 925
(2007) (quoting Gantt v. Sentry Ins., 1 Cal. 4th 1083, 1090 (1992)).

        Plaintiff alleges he was fired in violation of the public
policy delineated in Section 1102.5, which states:  "An employer may
not retaliate against an employee for disclosing information to a
government or law enforcement agency, where the employee has
reasonable cause to believe that the information discloses a violation
of state or federal statute, or a violation or noncompliance with a
state or federal rule or regulation."  Cal. Lab. Code § 1102.5(b).

        Defendant argues that Plaintiff was not fired in violation
of the public policy delineated in Section 1102.5 since Plaintiff
conceded he did not disclose information to a "government or law
enforcement agency."  (Mot. at 10:6-16; see Pl. Dep. at 200:12-23.)
However, "[e]ven though [Section 1102.5] addresses employee reports to
public agencies rather than to the employer . . ., it does evince a
strong public interest in encouraging employee reports of illegal
activity in the workplace."  Collier v. Sup. Ct., 228 Cal. App. 3d
1117, 1123 (1991) (holding employee who alleged he was fired in
retaliation for reporting illegal activity to his employer, but not to
a government agency, stated viable claim for wrongful termination in
violation of public policy).  Further, California's overtime laws
"concern not only the health and welfare of the workers themselves,

13

but also the public health and general welfare." <u>Gould v. Md. Sound</u>
<u>Indus., Inc.</u>, 31 Cal. App. 4th 1137, 1148 (1995) (holding that
plaintiff who alleged he was fired in retaliation for internal
complaint that employer was violating California overtime law stated
viable claim for wrongful termination in violation of public policy)
(quoting <u>Cal. Grape & Treee Fruit League v. Indus. Welfare Comm'n</u>, 268
Cal. App. 2d 692, 703 (1969)). Therefore, "if [Defendant] discharged
[Plaintiff] in retaliation for his reporting violations of the
overtime wage law to [Rotech] management, it violated a fundamental
public policy of this state." <u>Gould</u>, 31 Cal. App. 4th at 1150.

B. <u>Prima Facie Case</u>

Defendant argues Plaintiff has not established a prima facie
case of retaliation in violation of public policy since Plaintiff has
not offered evidence establishing a causal nexus between his complaint
about the comp time policy and the termination of his employment.
(Mot. at 11:9-12.)

"In order to establish a prima facie case of retaliatory
discharge in violation of public policy, Plaintiff must show . . .
there is a causal link between [his] protected activity and the
employer's action." <u>Frazier v. United Parcel Serv., Inc.</u>, 2005 WL
1335245, *11 (E.D. Cal. May 03, 2005) (citing <u>Flait v. N. Am. Watch</u>
<u>Corp.</u>, 3 Cal. App. 4th 467, 476 (1992)).

Defendant argues the seven month lapse of time between
Plaintiff's comp time policy complaint and his termination is too long
to suggest causation. (Mot. at 11:12-15.) However, "[t]here is no
set time beyond which acts cannot support an inference of retaliation.
Whether an adverse employment action is intended to be retaliatory is
a question of fact that must be decided in the light of the timing and

1  the surrounding circumstances." <u>Coszalter v. City of Salem</u>, 320 F.3d

2  968, 978 (9th Cir. 2003).

3       Plaintiff argues the timing of his termination suggests a

4  causal link in light of Neal's comments to Gilmore that Neal was angry

5  Plaintiff had complained about the overtime policy, including comments

6  made just days prior to Plaintiff's termination. (<u>See</u> Gilmore Dep. at

7  65:10-66:19.)  Further, Plaintiff offers evidence that Neal began

8  treating Plaintiff negatively after she learned he had complained

9  about the comp time policy.  Gilmore testified that Neal's attitude

10  toward Plaintiff changed, and Neal began criticizing Plaintiff behind

11  his back. (<u>Id.</u> at 38:3-39:18, 56:1-58:16.)  Five months after making

12  his complaint, Neal gave Plaintiff his first-ever disciplinary write-

13  up (for placing the American flag decal on the truck). (<u>See</u> Sher

14  Decl., Ex. 2.)  In light of the timing and the surrounding

15  circumstances, Plaintiff has presented sufficient evidence to

16  establish a prima facie case of retaliation.

17       C. Legitimate, Nonretaliatory Reason

18       Since Plaintiff has established a prima facie case, the

19  burden shifts to Defendant to articulate a legitimate, nonretaliatory

20  reason for its decision to fire Plaintiff. <u>Akers v. County of San</u>

21  <u>Diego</u>, 95 Cal. App. 4th 1441, 1453 (2002).  Defendant argues that

22  Plaintiff was terminated because "Neal determined that [Plaintiff] had

23  written in the date for the customer on [a delivery ticket] . . .

24  [and] was being dishonest about it by trying to disguise his

25  handwriting." (Mot. at 12:18-23.)  Plaintiff does not argue that

26  Defendant has failed to articulate a legitimate, nonretaliatory reason

27  for its decision to fire him.

28  ///

1     <u>D. Pretext</u>

2         Since Defendant has articulated a legitimate, nonretaliatory

3 reason for firing Plaintiff, the burden shifts back to Plaintiff to

4 prove intentional retaliation by offering direct evidence of

5 retaliatory intent or by showing Defendant's proffered reason is a

6 pretext for retaliation. <u>Akers</u>, 95 Cal. App. 4th at 1453. Defendant

7 argues Plaintiff has presented insufficient evidence to establish a

8 triable issue of pretext. (Mot. at 11:22-14:18.)

9         To meet his burden, Plaintiff "must offer substantial

10 evidence that [Defendant's] stated [nonretaliatory] reason for the

11 adverse action was untrue or pretextual, or evidence [Defendant] acted

12 with a [retaliatory] animus, **or a combination of the two**, such that a

13 reasonable trier of fact could conclude [Defendant] engaged in

14 [retaliatory termination in violation of public policy]." <u>Hersant v.</u>

15 <u>Dep't of Social Servs.</u>, 57 Cal. App. 4th 997, 1004-05 (1997) (emphasis

16 added). "Both direct and circumstantial evidence can be used to show

17 [Defendant's] intent to retaliate." <u>Colarossi v. Coty U.S. Inc.</u>, 97

18 Cal. App. 4th 1142, 1153 (2002). "Direct evidence of retaliation may

19 consist of remarks made by decision-makers displaying a retaliatory

20 motive." <u>Iwekaoqwu v. City of Los Angeles</u>, 75 Cal. App. 4th 803, 816

21 (1999). "Circumstantial evidence typically relates to such factors as

22 [P]laintiff's job performance, the timing of events, and how

23 [Plaintiff] was treated in comparison to other workers." <u>Colarossi</u>,

24 97 Cal. App. 4th at 1153.

25         Plaintiff argues he proffers direct evidence of retaliatory

26 motive: (1) Neal, who sought permission to fire Plaintiff and

27 ultimately fired him, communicated to Gilmore ten times that she was

28 angry that Plaintiff had complained about the comp time policy;

(2) Neal called Plaintiff's complaint a "lawsuit," and her comments were made to Gilmore in the context of her criticisms of Plaintiff which began after Neal learned of Plaintiff's complaint; and (3) Neal brought up the "lawsuit" to Gilmore just a few days prior to terminating Plaintiff. (See Gilmore Dep. at 65:10-66:19.)  Defendant contends that Neal's comments were "stray remarks" unrelated to the decisional process, and therefore they do not reveal a retaliatory motive. (Mot. at 11:24-12:14.)  In Nidds v. Schindler Elevator Corp., the Ninth Circuit held that a supervisor's comment that he intended to get rid of all the "old timers" was a stray remark that did not support an inference of age discrimination when employee was laid off, since the remark was "ambiguous" because it could refer either to "longtime employees" or to employees more than forty years old.  113 F.3d 912, 919 (9th Cir. 1996); see also Nesbit v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir. 1993) (holding comment by immediate supervisor to plaintiff that "we don't necessarily like gray hair" was "at best weak circumstantial evidence of discriminatory animus toward [plaintiff]").  Plaintiff counters Neal's comments were not stray remarks since the comments were made in the context of Neal's criticisms of Plaintiff's performance, were not few or isolated, and were directly tied to Plaintiff's termination since Neal's last comment was made only days before she fired Plaintiff. (Opp'n at 44:1-21; see Gilmore Dep. at 65:10-66:19.)  Further, Neal's comments were not ambiguous; they communicated her animus toward Plaintiff for complaining to Rotech about the comp time policy. (See Gilmore Dep. at 38:3-39:18, 56:1-58:16, 65:10-66:19.)

Plaintiff further argues he has presented circumstantial evidence that Defendant's stated nonretaliatory reason was pretextual.

(Opp'n at 45:5-83:20.)  Plaintiff argues that Rotech did not discipline or fire other employees for signing and dating delivery tickets, indicating this was a pretextual reason to fire Plaintiff. (Opp'n at 48:25-54:6; Decl. of Bethany Gilmore in Opp'n to Def.'s Mot. ("Gilmore Decl.") ¶ 8; Neal Dep. at 76:1-78:20; Pl. Decl. ¶ 33.) Defendant counters Gilmore was the only other similarly situated employee, and she was not disciplined or fired for signing and dating delivery tickets because she was a relatively new employee who was not held to the same standard of performance as Plaintiff, an experienced employee.  (Reply at 5:11-17.)  However, by the time Plaintiff was fired, Gilmore had been working at Rotech for at least six months. (Gilmore Decl. ¶ 1.)

Plaintiff argues that Neal's failure to investigate whether or not Plaintiff had actually forged the date on the delivery ticket at issue supports an inference of pretext.  (Opp'n at 54:7-59:22.) Neal did not ask Plaintiff or the patient at issue whether Plaintiff had filled in the date on the delivery ticket.  (Neal Dep. at 98:22-99:4.)  Further, Neal compared the delivery ticket at issue to only "a few" other delivery tickets for that patient when evaluating the handwriting.  (Id. at 99:12-100:8.)  Defendant counters Neal's investigation does not support an inference of pretext since she honestly believed that Plaintiff had dated the delivery ticket. (Reply at 6:21-7:6; Neal Decl. ¶ 10.)  However, a reasonable jury could conclude that Neal's investigation was so inadequate that Neal could not have honestly believed Plaintiff had forged the date on the delivery ticket.  Accordingly, the inadequacy of Neal's investigation supports an inference of pretext.

1    Plaintiff further argues that the reason given to him for
2  his termination continues to change, thus supporting an inference that
3  the delivery ticket date forgery reason is pretextual.  (Opp'n at
4  73:1-78:7.)  "[F]undamentally different justifications for an
5  employer's action . . . give rise to a genuine issue of fact with
6  respect to pretext since they suggest the possibility that . . . the
7  official reason[] was [not] the true reason."  Washington v. Garrett,
8  10 F.3d 1421, 1434 (9th Cir. 1993).  When Neal fired Plaintiff, she
9  told him he was being fired for forging the date on the delivery
10 ticket, as well as for the "service issues" she discovered during her
11 ride-along with Kauffer-West.  (Pl. Dep. at 127:18-131:6.)  Neal
12 testified that she fired Plaintiff based on an accumulation of
13 failures to follow direction, including the flag decal incident,
14 Plaintiff's taking the truck home at the end of the day, and the
15 delivery ticket date forgery.  (Neal Dep. 73:22-74:6, 79:3-14, 108:19-
16 109:8.)  Neal subsequently declared that she fired Plaintiff for
17 forging the date on the delivery ticket, and that the "service issues"
18 she discovered during the ride-along were not factors in her decision
19 to fire Plaintiff since she had already made the decision to fire
20 Plaintiff.  (Neal Decl. ¶ 12.)  Since Neal has always maintained that
21 she fired Plaintiff, at least in part, for forging the date on the
22 delivery ticket, Defendant has not stated fundamentally different
23 justifications that give rise to an inference of pretext.  See Nidds,
24 113 F.3d at 918 (holding that the presence of "shifting" or different
25 justifications for an adverse action is not sufficient to defeat
26 summary judgment when those justifications "are not incompatible").
27    Plaintiff argues that Neal attempted to "get dirt" on him
28 after she decided to fire him "in order to retroactively justify his

termination." (Opp'n at 61:20-21.) Neal rarely went on ride-alongs, but she decided to go on a ride-along the day she received permission to fire Plaintiff. (Neal Dep. at 117:23-25, 118:1-2; Neal Decl. ¶ 12.) Neal took notes about "service issues" that were intended to reflect negatively on Plaintiff's performance. (Id. at 122:18-25.) Neal listed these "service issues" as reasons for Plaintiff's termination when she fired Plaintiff. (Id. at 254:21-255:22.) A reasonable jury could infer that Neal had actively gathered negative information concerning Plaintiff, which "strongly suggests the possibility that [Neal] was engaged in a search for a pretextual basis for [terminating Plaintiff], which in turn suggests that the subsequent [termination] was for purposes of retaliation." Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1062 (2005).

Plaintiff further argues that his past performance and the timing of his termination support an inference of pretext. (Opp'n at 66:24-67:17.) Plaintiff had received only positive performance reviews and no disciplinary write-ups in his personnel file up until the time he complained about the comp time policy. (Sher Decl., Ex. 2; Neal Dep. at 172:9-19.) He had also received a merit-based discretionary pay raise every year except the year he complained about the comp time policy. (Pl. Decl. ¶ 4.) After Plaintiff complained about the policy, Neal began telling Gilmore criticisms about Plaintiff. (Gilmore Dep. at 38:3-39:18, 56:1-58:16.) Five months after Plaintiff's complaint, Neal gave Plaintiff a counseling notice for placing the American flag decal on the company truck, even though Plaintiff's testimony about Neal's phone conversation with him indicated she acquiesced to the placement of the decal as long as he

1  paid for it himself.  (Pl. Dep. at 113:13-114:15; Sher Decl., Ex. 13.)

2  Two months later, Neal fired Plaintiff.  (SUF ¶ 63.)

3          The summary judgment record reveals a genuine issue of

4  material fact exists as to whether Defendant's articulated,

5  nonretaliatory reason for firing Plaintiff was pretextual.

6  Accordingly, Defendant's motion for summary judgment on Plaintiff's

7  wrongful termination in violation of public policy claim is denied.

8  <u>III. Defamation</u>

9          Defendant seeks summary judgment on Plaintiff's defamation

10  claim.  (Mot. at 14-16.)  Plaintiff contends four of Neal's statements

11  were defamatory: (1)  Neal's statements to Wocjinski, in response to

12  Wocjinski's question why Plaintiff had been fired, wherein she stated

13  Plaintiff had been fired for "signing and dating delivery tickets" and

14  "putting down overtime that he had not actually worked – up to 2-4

15  hours a day"; (2) Neal's statements to Doug Neal and Amanda Rothchild

16  ("Rothchild") that she planned to fire Plaintiff; (3) Neal's

17  statements to Gilmore and Kauffer-West that Neal planned to fire

18  Plaintiff for "forging" the date on a delivery ticket; and (4) Neal's

19  written notes from her ride-along with Kauffer-West.  (Opp'n at 84:14-

20  22; <u>see</u> Wocjinski Decl. ¶¶ 3, 5; Kauffer-West Decl. ¶ 3; Neal Dep. at

21  267:22-2; Gilmore Dep. at 21:11-17; Sher Decl., Ex. 19.)

22          Under California law, "[t]o state a claim for defamation

23  . . . , [P]laintiff must establish 'the intentional publication of a

24  statement of fact that is false, unprivileged, and has a natural

25  tendency to injure or which causes special damage.'"  <u>Scott v. Solano</u>

26  <u>County Health & Soc. Servs. Dep't</u>, 459 F. Supp. 2d 959, 973 (E.D. Cal.

27  2006) (quoting <u>Smith v. Maldonado</u>, 72 Cal. App.4th 637, 645 (1999));

28  Cal. Civ. Code §§ 44-46.  "Publication means 'communication to a third

1   person who understands the defamatory meaning of the statement and its
2   application to the person to whom reference is made.'"   <u>Scott</u>, 459 F.
3   Supp. 2d at 973.

4          A statement is privileged if, <u>inter alia</u>, it is made "to a
5   person interested therein, (1) by one who is also interested, or (2)
6   by one who stands in such a relation to the person interested as to
7   afford a reasonable ground for supposing the motive for the
8   communication to be innocent, or (3) who is requested by the person
9   interested to give the information."   Cal. Civ. Code § 47(c) (the
10  "common-interest" privilege).  Although "[m]ere idle curiosity on the
11  part of the hearer is not enough" to make someone an "interested
12  person" for purposes of the common-interest privilege, <u>Swift & Co. v.</u>
13  <u>Gray</u>, 101 F.2d 976, 980 (9th Cir. 1939), the person is an "interested
14  person" if the statement is made in order to protect their interests.
15  <u>See</u> <u>id.</u> (holding customers of a corporation to whom the corporation
16  made alleged defamatory statements concerning one of the corporation's
17  employees were not "interested parties," and therefore the statements
18  were not privileged); <u>Williams v. Taylor</u>, 129 Cal. App. 3d 745, 752
19  (1982) (statements by company to customers regarding employee's
20  possible criminal activity were privileged since these statements
21  protected the interests of those customers).

22         However, the common-interest privilege does not apply if the
23  statement is made with "actual malice," "which is established by a
24  showing that the publication was motivated by hatred or ill will
25  towards the plaintiff or by a showing that the defendant lacked
26  reasonable grounds for belief in the truth of the publication and
27  therefore acted in reckless disregard of the plaintiff's rights."

28

1 <u>Noel v. River Hills Wilsons, Inc.</u>, 113 Cal. App. 4th 1363, 1370

2 (2003); Cal. Civ. Code § 47(c).

3        A. Neal's Statements to Wocjinski

4             Defendant argues the common-interest privilege applies to

5 these statements since Wocjinski requested Neal provide the

6 information why Plaintiff was fired. (Reply at 15:16-26.) Plaintiff

7 counters these statements were not privileged. (Opp'n at 85:13-22.)

8             Although Wocjinski requested the information from Neal, this

9 fact alone does not privilege Neal's statements because "[m]ere idle

10 curiosity on the part of the hearer is not enough" to make someone an

11 "interested person" for purposes of the common-interest privilege.

12 See <u>Swift</u>, 101 F.2d at 980. Neal's statements that Plaintiff was

13 fired for "signing and dating delivery tickets" and "putting down

14 overtime that he had not actually worked – up to 2-4 hours a day" did

15 not protect Wocjinski's interests. (<u>See</u> Wocjinski Decl. ¶¶ 3, 5.)

16 Therefore, Defendant has not shown that these statements were

17 privileged, and the motion on this ground is denied.

18        B. Neal's Statements to Doug Neal and Amanda Rothchild

19             Defendant argues Plaintiff offers insufficient evidence that

20 these statements were defamatory. (Reply at 16:16-21.) Although Neal

21 testified that she told her husband, Doug Neal, that Plaintiff would

22 be fired, Neal testified she did not remember exactly what she said

23 during this conversation. (Neal Dep. at 267:17-269:2.) Neal

24 testified that she told Rothchild, a Rotech employee, she "was going

25 to let [Plaintiff] go" and Neal is "sure" that she "discussed" with

26 Rothchild why Neal was firing Plaintiff, but Neal testified she did

27 not remember exactly what she said. (<u>Id.</u> at 263:17-264:18.)

28 Plaintiff presents no other evidence of what Neal said during either

conversation.  Since it cannot be presumed that what Neal told Doug
Neal and Rothchild was defamatory, Plaintiff has failed to present
sufficient evidence these statements were defamatory.  <u>See</u> <u>Quon v.</u>
<u>Arch Wireless Operating Co., Inc.</u>, 445 F. Supp. 2d 1116, 1151 (C.D.
Cal. 2006) ("Without such direct proof about what the defamatory
comment actually was . . . , summary adjudication in favor of the
defendants is required.").  Accordingly, Defendant's motion is granted
on this ground.

### C. Neal's Statements to Gilmore and Kauffer-West

        Defendant argues these statements were privileged because
Gilmore and Kauffer-West, as Rotech employees, "had an interest in
knowing why [Plaintiff] would no longer be working there."  (Reply at
16:8-10.)  Plaintiff counters the common-interest privilege does not
apply since these statements were made with malice, as Neal was either
motivated by ill-will toward Plaintiff or lacked a reasonable grounds
for belief in the truth of her statements.  (Opp'n at 90:26-91:2.)

        Gilmore testified that Neal frequently "talked about
[Plaintiff] behind his back" to Gilmore on a number of issues,
including Neal's belief that Plaintiff was spending too much time at
patients' houses, that Plaintiff was not using a new route planning
program, and that Plaintiff was not servicing as many patients as he
used to.  (Gilmore Dep. at 20:20-21:22.)  Neal brought up Plaintiff's
comp time policy complaint in conversation with Gilmore roughly ten
times, and Neal seemed "mad" and "didn't like" the fact that Plaintiff
complained about the comp time policy.  (<u>Id.</u> at 56:1-58:16, 65:19-
66:19.)  Further, Neal testified she concluded that Plaintiff had
forged the date on the delivery ticket since the handwriting did not
match the patient's signature on that ticket or the handwriting on two

other delivery tickets for that same patient.  (Neal Decl. ¶ 10.)
Neal only compared the delivery ticket at issue to two other delivery
tickets for that patient, even though many tickets for that patient
were available.  (Neal Dep. at 99:12-100:8.)  Moreover, Neal never
asked Plaintiff or the patient at issue whether Plaintiff had "forged"
the date.  (Neal Dep. 98:22-25.)

        Plaintiff has presented sufficient evidence for a reasonable
jury to conclude that Neal's statements to Gilmore and Kauffer-West
were motivated by ill will and/or that Neal lacked a reasonable
grounds for belief in the truth of her statements; therefore,
Defendant's motion on this ground is denied.

        D. Neal's Written Statement After the Ride-Along

        Defendant argues that this statement is not actionable since
it is "not defamatory, makes no reference to Plaintiff, and there is
no evidence it was ever published to any third party."  (Mot. at
16:13-22.)

        After Neal's ride-along with Kauffer-West on April 4, 2006,
she prepared a written statement.  (See Sher Decl., Ex. 19.)  However,
Plaintiff presents no evidence that this written statement was
published to a third party; or that another person saw this statement
or understood it referred to Plaintiff.  See Scott, 459 F. Supp. 2d at
973 ("Publication means 'communication to a third person who
understands the defamatory meaning of the statement and its
application to the person to whom reference is made."); Quon, 445 F.
Supp. 2d at 1151 ("Without . . . direct proof . . . that the defendant
actually made that comment to someone else, summary adjudication in
favor of the defendants is required.").  Accordingly, Defendant's
motion is granted on this ground.

IV. Overtime Pay and Waiting Time Penalties

Defendant seeks summary judgment on Plaintiff's claims for overtime pay and waiting time penalties.  (Mot. at 17:4-18:9.) Plaintiff seeks overtime compensation and waiting time penalties for the uncompensated hours he spent on call, and did not respond to an actual service request.  (Opp'n at 91:5-7.)

Whether on-call time is compensable depends on the analysis of two factors: (1) "whether the restrictions on [the employees' activities during the on-call] time are primarily directed toward the fulfillment of the employer's requirements and policies," and (2) "whether the employees' [on-call] time is so substantially restricted that they are unable to engage in private pursuits."  <u>Madera Police Officers Ass'n v. City of Madera</u>, 36 Cal. 3d 403, 409 (1984).

Plaintiff argues he was not able to effectively use the time as his own since he was required to carry a cell phone or pager, was not able to travel out of the Sacramento area, could not drink alcohol or go to noisy places where he might not hear the pager or cell phone, and had to be ready and prepared to respond to calls as soon as possible.  (Opp'n at 92:17-21; SUF ¶¶ 9-10; Pl. Dep. at 103:5-18.)  In addition, he had to stay close enough to the office so that he could pick up oxygen tanks or other equipment or supplies before responding to the service request.  (Opp'n at 93:1-5; Pl. Decl. ¶ 8.)  Each of these requirements was for Rotech's benefit, since they result from Rotech's need to have employees able to respond to service requests while on call.

Defendant counters that "based on [Plaintiff's] testimony about his activities while on call, the time was uncontrolled, and was properly not compensated" since "that time can be spent predominantly

1  for his own purposes . . . ." (Mot. at 18:8-9.)  While on call,
2  Plaintiff could not attend parties, was required to stay in the
3  Sacramento area, and could not consume alcohol.  (SUF ¶¶ 9-10; Pl.
4  Dep. at 103:5-18.)  However, other than these restrictions, Plaintiff
5  has not presented evidence showing he could not effectively engage in
6  private pursuits.  Plaintiff has also failed to present evidence
7  regarding how often he was required to respond to a service request
8  while on call.  Construing all facts and reasonable inferences in the
9  light most favorable to Plaintiff, Plaintiff has failed to present
10 sufficient evidence to show his on-call time was so substantially
11 restricted that he was unable to engage in private pursuits.  <u>See</u>
12 <u>Berry v. County of Sonoma</u>, 30 F.3d 1174, 1178-79, 1186 (9th Cir. 1994)
13 (holding on-call time was not compensable under federal law where
14 employees were required to respond to a call within fifteen minutes,
15 were unable to leave the county, were required to remain in areas
16 accessible by pager, and were unable to consume alcohol in amounts
17 which would affect their sobriety, but were otherwise able to
18 "effectively use on-call time for personal pursuits" such as
19 "socializ[ing] with friends, din[ing] out, shop[ping], read[ing],
20 watch[ing] television and enjoy[ing] hobbies"); <u>see also</u> <u>Henry v. Med-</u>
21 <u>Staff, Inc.</u>, 2007 WL 1998653, *6 (C.D. Cal. July 5, 2007) ("The
22 standard for determining whether on-call time is subject to hourly
23 compensation is largely the same under federal and California law.").
24 Accordingly, Defendant's summary judgment motion is granted on
25 Plaintiff's overtime claim.

26      Plaintiff seeks waiting time penalties under California law,
27 which imposes a penalty for failure to pay an employee's earned and
28 unpaid wages immediately upon discharge.  <u>See</u> Cal. Lab. Code §§ 201,

203.  Plaintiff argues Defendant should pay waiting time penalties since it did not properly compensate him for time spent on call. (Opp'n at 91:2-6, 93:7-8.)  Since this claim is premised on Plaintiff's overtime claim, Defendant's motion is granted on Plaintiff's waiting time penalties claim.

V. Section 17200 Violation

Defendant seeks summary judgment on Plaintiff's Section 17200 claim, arguing that since Plaintiff "cannot establish liability for any violation of the FEHA or failure to pay overtime, he cannot prove that Rotech engaged in any unfair competition in violation of [Section 17200]." (Mot. at 18:27-19:2.)  Plaintiff counters that his Section 17200 claim is "derivative of Plaintiff's overtime and public policy claims."  (Opp'n at 93, n.26.)

Section 17200 prohibits any "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code §§ 17200, et seq.  "An unlawful act is one 'forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made.'"  In re Pomona Valley Med. Group, Inc., 476 F.3d 665, 674 (9th Cir. 2007) (quoting Saunders v. Sup. Ct., 27 Cal. App. 4th 832, 838-39 (1994)).  In essence, Section 17200 "borrows violations of other laws and treats these as violations, when committed pursuant to business activity, as unlawful practices independently actionable under Section 17200 and subject to the distinct remedies provided thereunder."  Lagatree v. Luce, Forward, Hamilton & Scripps, 74 Cal. App. 4th 1105, 1110 n.1 (1990).  Defendant fails to cite authority showing Plaintiff's Section 17200 claim cannot be derivative of

1  Plaintiff's wrongful termination in violation of public policy claim.[3]

2  (See Mot. at 18:21-19:2; Reply at 20:24-21:3.)

3          Since issues of fact preclude summary judgment on

4  Plaintiff's wrongful termination in violation of public policy claim,

5  Defendant's motion for summary judgment on Plaintiff's Section 17200

6  claim is denied.

7  VI. IIED

8          Defendant seeks summary judgment on Plaintiff's IIED claim,

9  arguing the "conduct alleged was not extreme or outrageous as a matter

10 of law." (Mot. at 19:11-12.)  Plaintiff counters that Neal's conduct

11 was outrageous because (1) Neal fired Plaintiff in retaliation for

12 complaining about the comp time policy, and (2) Neal defamed Plaintiff

13 by telling others that he had been fired for "forgery." (Opp'n at

14 94:5-10.)

15         To state an IIED claim, Plaintiff must show extreme and

16 outrageous conduct causing severe emotional distress. Fisher v. San

17 Pedro Peninsula Hosp., 214 Cal. App. 3d 590, 617 (1989). "Behavior

18 may be considered outrageous if a defendant [] abuses a relation or

19 position which gives him power to damage the plaintiff's interest

20 . . . ." Hailey v. Cal. Physicians' Serv., 158 Cal. App. 4th 452, 474

21 (2007). "[T]ermination [of an employee] may or may not be outrageous

22 conduct depending on the surrounding circumstances." Maffei v.

23 Allstate Cal. Ins. Co., 412 F. Supp. 2d 1049, 1057 n.4 (E.D. Cal.

24 2006). "Terminating an employee for improper or discriminatory

25

26 ───────────────

27         [3]    Defendant also contends that Plaintiff's Section 17200 claim
   "should be dismissed because it is entirely superfluous and duplicative
   of [Plaintiff's] other claims." (Reply at 20:27-21:1.)   However,
28 Defendant raises this argument for the first time in its reply brief,
   and therefore it shall not be considered.

reasons . . . is insufficiently extreme or outrageous to give rise to a claim for intentional infliction of emotional distress." Walker v. Boeing Corp., 218 F. Supp. 2d 1177, 1190 (C.D. Cal. 2002) (citing Janken v. GM Hughes Elec., 46 Cal. App. 4th 55, 80 (1996)).  However, a termination may be outrageous if the plaintiff was also "insulted, degraded, yelled at, physically threatened, [] publicly humiliated," or the target of "racial slurs," or when the employment decision was "based on [the plaintiff's] personal life" unrelated to work. Helgeson v. Am. Int'l Group, Inc., 44 F. Supp. 2d 1091, 1096 (C.D. Cal. 1999).

Plaintiff has presented evidence that Defendant fired Plaintiff in retaliation for complaining about the comp time policy. (See supra.)  Plaintiff has also presented evidence that Neal told other employees and a non-employee that Plaintiff was fired for "forgery" and for claiming overtime that he had not actually worked. (See Wocjinski Decl. ¶¶ 3, 5; Kauffer-West Decl. ¶ 3; Gilmore Dep. at 21:11-17.)  Further, Plaintiff has presented evidence that supports the inference that Neal made those statements to other employees and a non-employee out of ill will toward Plaintiff and/or without a reasonable basis for belief in the truth of those statements, thus subjecting Plaintiff to public humiliation.  (See supra.)  A reasonable jury could find that this conduct was extreme and outrageous.  See Kelly v. Gen. Tel. Co., 136 Cal. App. 3d 278, 287 (1982) (holding that employer has position of power over employee, and therefore "the spreading of deliberately false statements that a former employee in effect committed forgery is extreme and outrageous conduct"); see also Prevost v. First W. Bank, 193 Cal. App. 3d 1492, 1496-97, 1504 (1987) (finding "triable issue as to whether

[employer's] actions amounted to outrageous conduct" where employer
fired plaintiff and then "informed a potential employer that
[plaintiff] had been terminated because he was not following standard
operating procedures regarding loans, lacked regard for customer's
privacy, and the [employer] had received a number of customer
complaints about him").  Accordingly, Defendant's motion for summary
judgment on Plaintiff's IIED claim is denied.

VII. Punitive Damages

        Defendant seeks summary judgment on Plaintiff's punitive
damages claim, arguing Plaintiff "cannot show that Neal's conduct was
malicious or oppressive," Plaintiff "cannot prove by clear and
convincing evidence that [Neal] was a managing agent," and no officer,
director or managing agent of "Rotech ratified Neal's allegedly
malicious or oppressive conduct."  (Mot. at 20:20-22, 21:14.)

        Under California law, Plaintiff can recover punitive damages
only if he establishes, by clear and convincing evidence, that
Defendant was "guilty of oppression, fraud, or malice."  Cal. Civ.
Code § 3294(a).  Punitive damages against a corporate employer are
only permitted if an "officer, director, or managing agent of the
corporation" participates in or ratifies the oppression, fraud, or
malice.  Id. § 3294(b).  Managing agents are those corporate employees
who "exercise[] substantial discretionary authority over significant
aspects of a corporation's business" and "who exercise substantial
independent authority and judgment in their corporate decisionmaking
so that their decisions ultimately determine corporate policy."
White v. Ultramar, Inc., 21 Cal. 4th 563, 566-67, 577 (1999).  Mere
"supervisory status" does not mean that an employee is a "managing
agent."  Id. at 575.  "[A] supervisor must be in a corporate

31

policymaking position in order to be considered a managing agent for purposes of imposing punitive damages liability on the employer." Myers v. Trendwest Resorts, Inc., 148 Cal. App. 4th 1403, 1437 (2007).

Neal was responsible for supervising two Rotech employees at the West Sacramento office. (Neal Decl. ¶ 3.) Rotech has more than 4,500 employees in forty-eight states across the country. (Ochab Decl. ¶ 2.) Rotech's Chief Human Resources Officer declared Neal did not have authority to determine corporate policy. (Decl. of Jack McKenna in Supp. of Def.'s Mot. ¶ 5.) Neal reported to an Area Manager, who in turn reported to a Regional Manager. (Neal Decl. ¶ 3.) Neal declared that her job was "to do my best to make sure we operated within the company's requirements." (Id. ¶ 7.) The summary judgment record reveals Neal lacked the authority to fire Plaintiff, and first had to obtain permission from the Rotech human resources department. (Neal Decl. ¶ 11.)

Plaintiff contends Neal was nevertheless a managing agent because she was an "ad hoc policymaker" who "allowed, permitted and directed her employees to follow a whole different set of policies apart from the written ones she had been provided." (Opp'n at 98:14-17.) However, evidence that Neal permitted Plaintiff to routinely ignore certain corporate policies (including the policy regarding filling in dates and signatures on delivery tickets and returning company trucks to the office at night) is not clear and convincing evidence that Rotech granted Neal substantial independent authority to make decisions that ultimately determined corporate policy. (Neal Dep. at 338:1-339:4; Pl. Decl. ¶ 34.) See Myers, 148 Cal. App. 4th at 1436-37 (finding supervisor who disobeyed upper management and "ran

[his] own store," but was not allowed to "bend upper management's policies," was not a managing agent).

Plaintiff further argues Neal's alleged status as an "exempt employee," under Industrial Welfare Commission Wage Order, No. 4, section (1)(A)(1), indicates she was a managing agent.  (Opp'n at 99:17-100:9.)  However, liability for punitive damages does not "depend on [an] employee's managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy."  <u>White</u>, 21 Cal. 4th at 576-77.  Further, Neal's alleged status as an "exempt employee" does not provide clear and convincing evidence showing Neal had substantial independent authority to make decisions that ultimately determined corporate policy.

Plaintiff also fails to offer clear and convincing evidence that an officer, director, or managing agent of Rotech had advance knowledge of or ratified Neal's alleged decision to terminate Plaintiff in retaliation for complaining about the comp time policy. Even if Crain, the employee who gave Neal permission to fire Plaintiff, was a managing agent, the summary judgment record reveals Crain did not remember Plaintiff had made the comp time policy complaint at the time Crain gave Neal permission.  (Neal Dep., Ex. 1; Crain Decl. ¶ 6.)  <u>See</u> <u>Coll. Hosp., Inc. v. Sup. Ct.</u>, 8 Cal. 4th 704, 726 (1994) ("Corporate ratification in the punitive damages context requires actual knowledge of the conduct and its outrageous nature."). Further, Plaintiff offers no evidence that a Rotech officer, director or managing agent ratified Neal's alleged malicious conduct. Accordingly, Defendant's motion for summary judgment on Plaintiff's punitive damages claim is granted.

<u>SUMMARY</u>

For the foregoing reasons, Defendant's summary judgment motion is granted on: (1) Plaintiff's FEHA claim; (2) Plaintiff's defamation claim for Neal's alleged statements to Doug Neal, Neal's alleged statements to Rothchild, and Neal's written notes following the ride-along; (3) Plaintiff's overtime claim; (4) Plaintiff's waiting time penalties claim; and (5) Plaintiff's punitive damages claim.   The remainder of the motion is denied.

IT IS SO ORDERED.

Dated:  May 21, 2008

_____
GARLAND E. BURRELL, JR.
United States District Judge